ARIPPA, Petitioner,

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**Mid–Atlantic Power Supply Association, Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

**York County Solid Waste And Refuse Authority, Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

**Clean Air Council And Citizen Power, Inc., Petitioners,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 7, 2001.

Decided Feb. 21, 2002.

See also 735 A.2d 1282.

Patricia Armstrong, Harrisburg, for petitioner, ARIPPA.

Harvey L. Reiter, Washington, D.C., for petitioners, Clean Air Council and Citizen Power, Inc.

Benjamin L. Willey, Washington, D.C., for petitioner, York County Solid Waste and Refuse Authority.

Karen O. Moury, Harrisburg, for respondent.

John F. Povilaitis, Harrisburg, for intevenors, Metropolitan Edison Co., PA Electric Co., GPU, Inc. and First Energy Corp.

Tanya J. McCloskey, Harrisburg, for intervenor, Office of Consumer Advocate.

Before DOYLE, Senior Judge,[1] COLINS, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Senior Judge,[2] and LEADBETTER, Judge.

---

1. This case was assigned to the opinion writer prior to the date when President Judge Doyle assumed the status of senior judge on January 1, 2002.

2. This case was assigned to the opinion writer prior to the date when Judge Kelley assumed the status of senior judge on January 1, 2002.

PELLEGRINI, Judge.

ARIPPA, Mid–Atlantic Power Supply Association (Mid–Atlantic), York County Solid Waste and Refuse Authority (York County), Clean Air Council (Clean Air) and Citizen Power, Inc., (Citizen) appeal from two orders of the Pennsylvania Public Utility Commission (Commission): the first dated May 24, 2001, granting the application filed by GPU, Inc. and its Pennsylvania public utility subsidiaries, Metropolitan Edison Company (Met–Ed) and Pennsylvania Electric Company (Penelec) (collectively, GPU Energy) and FirstEnergy Corp. for the merger of GPU into FirstEnergy and the second dated June 20, 2001, approving the "Settlement Stipulation" proposed by GPU Energy and First Energy joined by the Consumer Advocate (as well as other signatories to the Settlement Stipulation who are not parties to this appeal) [3] and accepting a deferral accounting mechanism as a means to recover their increased costs above the rate cap imposed in return for recovering stranded costs under the Electricity Generation Customer Choice and Competition Act (Competition Act).[4]

This case involves two separate proceedings that were consolidated before the Commission and have been consolidated on appeal. One proceeding involves the merger between FirstEnergy and GPU Energy and its opposition by Clean Air and Citizen. The second proceeding involves a petition filed by FirstEnergy and GPU Energy in which they sought expedited Commission approval of what they denominated a "Settlement Stipulation." That Stipulation authorized increased revenues through an interim deferral tracking mechanism for their provider of last resort

generation service. ARIPPA, Mid–Atlantic, York County, Clean Air and Citizen opposed the Stipulation and the tracking mechanism.

GPU Energy is a public utility holding company with headquarters in Morristown, New Jersey. GPU owns all of the common stock of Met–Ed and Penelec, as well as that of Jersey Central Power & Light Company, an electric public utility that conducts business in New Jersey. The GPU Energy utilities together serve about 2.1 million customers in Pennsylvania and New Jersey. Met–Ed and Penelec, GPU subsidiaries, are electric public utilities incorporated under the laws of Pennsylvania and headquartered in Reading, Pennsylvania. They conduct business in Pennsylvania and serve approximately one million customers in territories encompassing over 20,000 square miles in northern, central and eastern Pennsylvania.

FirstEnergy is a diversified energy services holding company headquartered in Akron, Ohio. It was formed in 1997 as a result of the merger of Ohio Edison Company and Centerior Energy Corporation. It directly owns three electric utility operating companies in Ohio, including Ohio Edison Company which owns Pennsylvania Power Company operating in portions of western Pennsylvania. Those operating companies serve 2.2 million customers in a 13,200 square mile area in northern and central Ohio and western Pennsylvania.

The petitioners represent three different interests: (1) those entities that have an interest in protecting the integrity of the NUG contracts that were entered by those entities and GPU Energy which include ARIPPA, formerly known as Anthracite

---

**3.** Those parties include the Office of Small Business Advocate; Met–Ed Industrial Users Group; Penelec Industrial Consumer Alliance; and Citizens for Pennsylvania's Future.

**4.** 66 Pa.C.S. §§ 2801–2812.

Region Independent Power Producers Association, a trade association composed of 12 operating non-utility generation (NUG) power plants [5] across Pennsylvania, and York County, a municipal solid waste authority and a NUG; (2) Mid–Atlantic, a trade association of power marketers, as well as independent power producers and a broad range of companies that support the electric services industry with an interest in promoting competition in the electric power supply market in Pennsylvania and the Mid–Atlantic region; and (3) public interest/environmental groups Clean Air and Citizen.

## I.

### A. HISTORY

Historically, electric utilities in Pennsylvania provided three services to customers: the generation, transmission and distribution of electricity. *PP & L Industrial Customer Alliance v. Pennsylvania Public Utility Commission*, 780 A.2d 773 (Pa. Cmwlth.2001). These "bundled" services were performed by one local utility that held a monopoly over its service area. However, to encourage a competitive wholesale electric market and to provide cost savings to consumers, in December 1996, the Competition Act was enacted to establish competition in the sale of electric power. *Id.* That Act "unbundled" or separated the three traditional functions and allowed Pennsylvania residents to choose to purchase their electricity from other instate or out-of-state electric generation suppliers (EGS), who would generate and sell electricity directly to the consumers. *Id.* If the consumers chose to purchase their electricity from a supplier other than the local utility, the local utility also referred to as an electric distribution company still remained responsible for the transmission and distribution of the electricity. If consumers did not choose to or were unable to purchase power from another supplier, the local utility was still required to provide electricity to them as the Provider of Last Resort (PLR) at the rate cap amount. 66 Pa.C.S. § 2802(16).[6]

The switch from regulation to competition created "stranded costs," costs alleged

---

**5.** NUG contracts are "must take" agreements with definitive price terms, i.e., an electric provider must take all power generated by the NUG pursuant to explicit and firm contract pricing mechanisms. Prior to 1997, the regulatory context of NUG contracts was such that GPU Energy recovered the full costs of its purchased power agreement by a pass-through to ratepayers. *See Barasch v. Pennsylvania Public Utility Commission*, 119 Pa. Cmwlth. 81, 546 A.2d 1296 (1988); *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission*, 135 Pa.Cmwlth. 15, 579 A.2d 1337 (1990), *affirmed per curiam*, 535 Pa. 108, 634 A.2d 207 (1993), *cert. denied sub nom West Penn Power Company v. Pennsylvania Public Utility Commission*, 513 U.S. 925, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994). After the enactment of the Competition Act in 1997, GPU Energy folded its NUG contract costs into its rate base but certain NUG contract costs that were above market rates were considered stranded costs.

**6.** Specifically, 66 Pa.C.S. § 2802(16) provides:

> It is in the public interest for the transmission and distribution of electricity to continue to be regulated as a natural monopoly subject to the jurisdiction and active supervision of the commission. Electric distribution companies should continue to be the provider of last resort in order to ensure the availability of universal electric service in this Commonwealth unless another provider of last resort is approved by the commission.

This means that if a customer contracts for electric energy and it is not delivered or if a customer does not choose an alternative electric generation supplier, the PLR, usually the local utility, is required to purchase electric energy at prevailing market prices to service that customer but can recover fully all reasonable costs. *See Mid–Atlantic Power Supply v. Pennsylvania Public Utility Commission*, 755 A.2d 723 (Pa.Cmwlth.2000).

not to be recoverable at market rates.[7] The amount of stranded costs is determined by the difference between the amount of revenue that could have been recovered in a regulated market and those recoverable under the current deregulated system. To allow electric utilities to recover their transition or stranded costs, the General Assembly created the competitive transition cost. 66 Pa.C.S. § 2808. These costs were to be paid by each ratepayer accessing the transmission or distribution network to the electric distribution company in whose certificated territory those customers were located. 66 Pa.C.S. § 2803 defines the competitive transition cost as "[a] nonbypassable charge applied to the bill of every customer accessing the transmission or distribution network which (charge) is designed to recover an electric utility's transition or stranded costs as determined by the commission under sections 2804 (relating to standards for restructuring of electric industry) and 2808 (relating to competitive transition charge)." A competitive transition charge was to be calculated separately for NUG-stranded costs and the other stranded costs the utility incurred. 66 Pa.C.S. § 2806(c). As a result, ratepayers' monthly electric bill has two components: one for current amounts of electricity consumed, i.e., the cost of current transmission, distribution and generation costs, and one for the transition charge for these stranded costs.

Under the legislative scheme, in exchange for utilities being paid for their stranded costs, rate caps, with certain exceptions that are at issue in this appeal, were imposed on the rate a utility could charge for electricity for a period of 54 months (December 31, 2004) or until stranded costs were no longer being paid to a utility. 66 Pa.C.S. § 2804(4). Necessarily, if the competitive market rate for electricity was above the rate cap level, customers would then return as customers to buy electricity from the local utility which was obligated to serve them at that rate as the provider of last resort.

## B. RESTRUCTURING PLAN

To implement restructuring, each Pennsylvania electric distribution company was required to file a Restructuring Plan (Plan) setting forth how it was going to come into compliance with the mandates of the Competition Act. 66 Pa.C.S. § 2806(d).[8] On June 2, 1997, GPU's subsidiaries, Met–Ed and Penelec, submitted comprehensive Plans requesting the Commission approve (1) the imposition of unbundled rates, competitive transition costs and specific tariff provisions to ensure customers direct access to all electric generation suppliers licensed to offer such services within the Commonwealth; (2) the recovery by Met–Ed of $1.476 billion of stranded costs net of mitigation and the recovery by Penelec of $1.322 billion of stranded costs net of mitigation; (3) the implementation of plans to meet their universal service obligations; and (4) the implementation of a proposed Consumer Education Program. Following a hearing before an Administrative Law Judge (ALJ), the Commission issued separate opinions and orders on Met–Ed and Penelec's Plans establishing their stranded costs and their transmission and distribu-

---

7. *See* 66 Pa.C.S. § 2803.

8. That section provides:
 All electric utilities in this Commonwealth shall submit to the commission, pursuant to a schedule to be determined by the commission in consultation with the electric utilities, beginning on April 1, 1997, but in no event later than September 30, 1997, a restructuring plan to implement direct access to a competitive market for the generation of electricity. 66 Pa.C.S. § 2806(d).

tion rates for 1999 from which Met–Ed and Penelec appealed.

During the pendency of their appeals, Met–Ed, Penelec and the other parties to the restructuring proceeding participated in a settlement conference to resolve the issues raised on appeal. Prior to the settlement conference, the parties agreed that no settlement agreement would be presented to the Commission unless all conference participants agreed to the proposal. Shortly after the conclusion of the conference, Met Ed, Penelec and various other parties representing divergent interests submitted by joint petition to the Commission details of a settlement agreement (Restructuring Settlement) reached among the signatories.[9]

Under the Restructuring Settlement, Met–Ed and Penelec were permitted to recover stranded assets and costs from their retail customers through a competitive transition cost which included a separate accounting mechanism to track recovery of operating NUG-related stranded costs. This mechanism would continue until all NUG contracts terminated or until December 31, 2020, whichever came first.[10] Met–Ed and Penelec were also required to create separate NUG Trusts in which the cumulative net of tax revenues received from the competitive transition charge for NUGs in excess of the stranded NUG costs would be deposited in order to ensure payment of ongoing NUG obligations under existing NUG power purchase contracts. Also, as allowed by the Restructuring Settlement, the GPU subsidiaries,

Met–Ed and Penelec, completed steps to sell all of their generation assets at fair market value to third parties. Met–Ed and Penelec agreed to apply the net divestiture proceeds in the following order of priority: (1) the balance of company-owned generation costs; (2) regulatory assets (including NUG buyouts and prior NUG deferrals); (3) nuclear decommissioning costs; and (4) operating NUG costs.

The Restructuring Settlement also established the Competitive Default Service (CDS)[11] which used a competitive bid process to assign retail customers a PLR other than Met–Ed or Penelec. In exchange, the other signatories agreed to resolve their objections to Met–Ed and Penelec's Restructuring Plans and to withdraw all challenges to the Competition Act pending before this Court and all proceedings pending before this Court and the United States District Court challenging the Commission's Restructuring Orders.

On October 20, 1998, the Commission entered a final order approving the terms of the joint petition. That order was upheld by this Court. *See George v. Pennsylvania Public Utility Commission,* 735 A.2d 1282 (Pa.Cmwlth.1999), *petition for allowance of appeal denied,* 563 Pa. 650, 758 A.2d 1202 (2000).

## II.

### A. MERGER

On November 9, 2000, GPU Energy and FirstEnergy filed a Joint Application with

---

**9.** The signatories to the Restructuring Settlement who are relevant to the present matter include Met–Ed, Penelec, ARIPPA, Mid–Atlantic, York County, Office of Consumer Advocate, Office of Small Business Advocate, Office of Trial Staff, Met–Ed Industrial Users Group and Penelec Customer Alliance.

**10.** Under the Restructuring Agreement, Met Ed's NUG-related stranded costs expected to be recovered were $658.41 million. Penelec's

NUG-related stranded costs were $332.16 million.

**11.** Under the CDS program, customers were to be assigned to licensed competitive electricity generation service suppliers who competitively bid to provide PLR services to such customers at or below existing Met–Ed and Penelec generation rate caps.

the Commission seeking approval of the proposed merger of GPU Energy with FirstEnergy. Under the terms of the merger, FirstEnergy would acquire all of GPU Energy's outstanding shares of common stock for approximately $4.5 billion in cash, and FirstEnergy would assume GPU Energy's outstanding indebtedness totaling about $7.4 billion of debt and preferred stock.[12] Following completion of the merger, Met Ed and Penelec would be wholly-owned public utility company subsidiaries of FirstEnergy.

The purported purpose of the merger was to offer "significant strategic advantages that would be of substantial value to Pennsylvania's future economic growth" and result in overall aggregate cost saving opportunities.[13] FirstEnergy and GPU Energy averred that the combination of their resources, years of utility experience, and expertise of the two companies would enhance the capabilities of Met–Ed and Penelec so that those subsidiaries could

fulfill their obligations to provide safe, adequate and reliable service to their retail customers in Pennsylvania.[14] The parties also averred that there would be no adverse effect on competition in the supply and distribution of electricity in Pennsylvania. Among many others, ARIPPA, Mid–Atlantic, York County, Clean Air and Citizen (Intervenors) filed protests and petitions to intervene.

Pursuant to 66 Pa.C.S. § 2811(e)(1),[15] the Commission had to consider whether the proposed merger was likely to result in anti-competitive or discriminatory conduct, including the unlawful exercise of market power, which would prevent retail electricity customers in Pennsylvania from obtaining the benefits of a properly functioning and workable competitive retail electricity market. Because the Applicants also needed a certificate of public convenience pursuant to Section 1102(a)(3) of the Public Utility Code (Code), 66 Pa.C.S. § 1102(a)(3),[16] which authorizes a public

12. Fred D. Hafer, Chairman, Chief Executive Officer and President of GPU Energy, testified as a witness for the applicants, stating that after the merger, "[t]he combination of FirstEnergy and GPU would create the nation's sixth largest investor-owned electric system, based on customers served." (Testimony of Fred D. Hafer at pp. 3–4 of his direct testimony.)

13. FirstEnergy stated in the application that it estimated a total annual savings of $150 million for the combined company based upon an assumed 5% reduction in operating and maintenance costs that had been typical of other mergers.

14. The application also indicated that the merger would enhance the capability of the merged parent companies to invest in new facilities and emerging technologies that would be cost prohibitive for a smaller company and would provide customers with a wider range of energy services and products than either company could alone achieve.

15. 66 Pa.C.S. § 2811(e)(1) provides the following:

In the exercise of authority the commission otherwise may have to approve the mergers or consolidations by electric utilities or electricity suppliers, or the acquisition or disposition of assets or securities of other public utilities or electricity suppliers, the commission shall consider whether the proposed merger, consolidation, acquisition or disposition is likely to result in anticompetitive or discriminatory conduct, including the unlawful exercise of market power, which will prevent retail electricity customers in this Commonwealth from obtaining the benefits of a properly functioning and workable competitive retail electricity market.

16. Section 1102(a)(3) of the Code provides:

Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful:

(3) For any public utility or an affiliated interest of a public utility as defined in

utility or an affiliated interest of a public utility [17] to acquire from or transfer to any other entity by any means whatsoever the title to, or the possession or use of, any tangible or intangible property used or useful in the public service,[18] under Section 1103(a) of the Code, 66 Pa.C.S. § 1103(a), they had to prove and the Commission had to find that the granting of the certificate was necessary or proper for the service, accommodation, convenience or safety of the public.

At the hearing before the ALJ, Anthony J. Alexander, President of FirstEnergy, testified on behalf of FirstEnergy and GPU Energy regarding the general benefits of the merger and alleged that the merger would result in the following benefits:

- there would be no adverse impact on GPU Energy's continued ability to provide safe and adequate utility service in Pennsylvania, and no effect on the Commission's jurisdiction over its adequacy and reliability of service;

- overall aggregate cost savings opportunities were estimated at about $150 million per year on a total combine company basis;

- there would be no adverse impact on either the wholesale or retail markets; and

- FirstEnergy would be in a position to provide additional assistance to GPU Energy in meeting its PLR obligations.

Intervenors, however, argued that the merger could expose ratepayers to substantial risks with no assurance of any benefits for Pennsylvania or its consumers and would enhance shareholder profits by using utility assets and customers to create opportunities in other unregulated markets. They further argued that GPU Energy shareholders were expected to receive a premium that exceeded book value and market value—a payment of over $1 billion—and projected earnings growth from the merger of 7% to 8% translating into an anticipated present value of approximately $900 million for shareholders.

Intervenors also argued that the risks of the merger to ratepayers and Pennsylvania included:

- no benefit to the public from FirstEnergy assisting with the procurement of GPU Energy's PLR supply because there was no evidence that the merger would allow FirstEnergy to mitigate costs and risks of procuring PLR service, and even if FirstEnergy could reduce PLR supply costs to GPU Energy, there was no mechanism in place to ensure that customers would see

---

section 2101 (relating to definition of affiliated interest), except a common carrier by railroad subject to the Interstate Commerce Act, to acquire from, or to transfer to, any person or corporation, including a municipal corporation, by any method or device whatsoever, including the sale or transfer of stock and including a consolidation, merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service.

17. Met–Ed and Penelec are Pennsylvania public utilities by definition under Section 102 of the Code, 66 Pa.C.S. § 102. GPU and FirstEnergy are public utility affiliates as the parent holding companies of Met Ed, Penelec and Penn Power.

18. The proposed merger was to result in a new controlling interest as that term is used in the Commission's statement of policy at 52 Pa.Code § 69.901, which provides that such a merger, even though at a parent company level, should be viewed as constituting a transfer of utility property requiring Commission approval under Section 1102(a)(3) of the Code.

any benefit from lower prices once the protection of price caps were removed;

- the failure of ratepayers to receive a reasonable share of the $150 million merger-related cost savings because Applicants did not propose to pass the cost savings on to customers;
- ratepayers being harmed by a future increase in rates related to the acquisition premium of $1 billion paid to GPU Energy shareholders and merger costs (costs to achieve);
- FirstEnergy not continuing to honor its NUG contracts consistent with their terms ensuring that the NUGs were provided financial surety in the event GPU Energy's new parent suddenly attempted divestiture of the NUG contracts;
- ratepayers being denied the benefits of a competitive retail electricity market because even if wholesale markets were competitive, the public interest could be thwarted if a few sellers with market power controlled retail markets; and
- an adverse effect on Pennsylvania air quality as a result of FirstEnergy's increased output from its plants.

The ALJ recommended that the Commission approve the merger. He determined there would be substantial benefits because the merged company would be able to meet about 20%–25% of GPU Energy's PLR obligation. The ALJ also determined that ratepayers could receive a reasonable share of merger-related cost savings by extending the rate caps for Met–Ed and Penelec through 2007 as a way to pass merger savings through to ratepayers. As to ratepayers being unfairly burdened by costs to achieve the merger, the ALJ recommended that the

Applicants not recover the acquisition premium that FirstEnergy was paying for GPU Energy from Pennsylvania ratepayers. He also found that:

- the merger would have no impact on the NUG contracts because there were no plans to assign these contracts;
- relying on the testimony of applicants, the merger was not likely to result in anticompetitive or discriminatory conduct;
- the Generation Company (GENCO) Code of Conduct [19] would continue to apply governing affiliate transactions and Met–Ed and Penelec would continue to be subject to all of the Commission's existing rules and regulations that impacted retail competition; and
- the record did not support a finding that the merger would either benefit or harm the environment.

In summary, the ALJ made the following recommendations of conditions so that the risks did not outweigh the merger benefits:

One condition is that the merged company must flow merger-related savings through to ratepayers by an extension of the transmission and distribution rate caps from December 31, 2004 to December 31, 2007. Tied to this condition is the need to ensure that the merged company will not seek to recover the acquisition premium from Pennsylvania ratepayers and the condition that the merged company be required to expense or amortize the costs to achieve over the transmission and distribution rate cap extension period. Other merger conditions recommended below, such as directing the merged company to adhere

19. The GENCO Code of Conduct governs transactions between the provider of last resort and affiliated entities owning generation assets. For example, it restricts the ability of GPU Energy to purchase generation supply on favorable terms from an affiliate.

to the current GPU Energy Codes of Conduct in Pennsylvania, to receive Commission permission before withdrawing GPU Energy transmission facilities from PJM, implementing a Service Quality Index, and protecting the overfunded GPU Energy pension fund, will ensure that the merger promotes the service, accommodation, convenience or safety of the public.

Intervenors filed exceptions to the ALJ's decision. By order dated May 24, 2001, the Commission denied the exceptions and approved the merger but attached, among others, the following conditions:

- the GPU Energy Code of Conduct shall apply to the merger and to the activities of FirstEnergy in Pennsylvania after the merger;
- the merged company shall not withdraw the transmission facilities of Met–Ed or Penelec from the operational control of PJM [20] unless the merged company or one of its subsidiaries had first applied for an obtained authorization from the Commission; and
- the acquisition premium associated with the merger shall not be recovered from the ratepayers of Met–Ed or Penelec.

## B. RATE INCREASE

As mentioned, under the Competition Act, the incumbent regulated utility was to be the Provider of Last Resort (PLR) for electricity if customers did not choose to purchase power from alternative suppliers, but the rates that the incumbent utility could charge were capped by the Act until December 31, 2004. The utility, however, was authorized to seek a rate increase under the Act if the amount it had to pay for purchased power to meet its PLR obligation was outside the control of the utility and made it unable to receive a fair rate of return.

Less than two years into the process, GPU Energy contended that its costs increased because the "competitive default service program," which would direct retail electric customers to competitive providers, was unsuccessful. Under the competitive default service program, customers who did not choose an "alternative supplier" would be assigned to a licensed competitive electricity generation service supplier commencing June 1, 2000. The competitive default service program envisioned that suppliers would competitively bid to provide PLR service to customers at or below the existing GPU Energy generation rate caps.[21] Be-

---

**20.** PJM is the Pennsylvania–New Jersey–Maryland Interconnect, a pool comprised of eleven electric utilities serving portions Pennsylvania, New Jersey, Maryland, Delaware, the District of Columbia and Virginia. *Lukens Steel Company v. Pennsylvania Public Utility Commission,* 92 Pa.Cmwlth. 530, 499 A.2d 1134 (1985). PJM ensures electric system reliability and has in place procedures that it implements when anticipated customer demand exceeds the available generation resources in its area. *PP & L Industrial Customer Alliance v. Pennsylvania Public Utility Commission,* 780 A.2d 773 (Pa.Cmwlth.2001).

**21.** 66 Pa.C.S. § 2804(4) provides caps on electric utility rates until an electric distribu-

tion utility is no longer recovering its transition or stranded costs through a competitive transition charge or intangible transition charge and all of its customers can choose an alternative provider of electric generation. While the caps exist, the Competition Act also allows a utility to request relief from the rates for a variety of reasons, including that the utility is subject to significant increases in the rate of purchased power that are outside the control of the utility and would not allow the utility to earn a fair rate of return. 66 Pa.C.S. § 2804(4)(D). Because GPU Energy had sold all of its capacity and had to obtain capacity elsewhere and the market prices went up,

cause the cost of electricity under the rate caps was less than what suppliers were willing to bid, no bids were submitted. Because GPU Energy had sold all of its captive sources of generation but was still required to provide PLR power,[22] it incurred significant losses because wholesale electricity prices climbed well above the levels in its capped rates.

To make up its losses, at the same time it sought to have the merger approved, on November 29, 2000, GPU Energy filed a petition requesting expedited Commission authorization to implement what it termed an interim deferral tracking mechanism (DTM)[23] for its PLR generation service (PLR service) to recover excess costs it incurred as a PLR.[24] Due to uncertainty about market rates and losses they was incurring, GPU Energy requested expedited review and disposition of its petition by the Commission in order to make provisions for PLR service in 2001 and subsequent years.[25] It alleged it needed "both immediate and longer term contingency protection from significant purchased power cost increases over which [it has] no control, and which pose a serious threat to [its] current and longer term financial health." It explained that with higher market energy prices and customers returning to rate-capped PLR service, providing that service was expected to result in a net under-recovery for the year 2000 of over $42 million from PLR service in Pennsylvania, as well as estimated supply losses of $250 million in 2001 and over $300 million in 2002.

To recover those costs, the petition proposed a DTM that would not impose any immediate increase in customers' rates but would permit GPU Energy to defer for accounting and regulatory purposes the actual costs it incurred above the present capped rate levels to provide PLR service to customers on and after January 2, 2001. GPU Energy agreed to offset all savings arising from PLR purchase power costs it incurred that fell below its present rate caps as a credit to the deferral balance.[26]

GPU Energy was seeking relief from the rate increases.

22. As an electric distribution company, GPU Energy was required to provide electric energy to customers within its territories who either contracted for electric energy and that service was not delivered or who failed to choose an alternative electric generation supplier pursuant to 66 Pa.C.S. § 2802(16). Because GPU Energy sold all of its electric generation assets, it had to purchase electric generation on the open market, thereby subjecting itself to the volatility of market prices.

23. The DTM suggested by GPU Energy would permit the companies to defer for accounting and regulatory purposes, beginning January 1, 2001, the net difference between their retail charges for PLR generation service and their actual market cost of supply. The DTM would track the actual costs incurred for PLR service, including any savings if actual costs fell below current charges to customers.

24. The companies filed a restructuring plan with the Commission on June 2, 1997, and the Commission approved a settlement of the restructuring proceeding by final order dated October 20, 1998.

25. Under Section F.2 of the Restructuring Settlement, the Commission is required to conduct an annual review of the CDS process to consider whether it is in the public interest to continue with the implementation of the program.

26. GPU Energy requested the Commission to approve the following rate recovery plan which would defer the collection of all current costs to secure PLR supply that were above the applicable generation rate caps and avoid the necessity for any immediate rate cap increases:

● GPU Energy would be permitted, beginning January 1, 2001, to defer the net difference between its retail charges for generation service and their market cost of supply.
● This net cumulative amount in the case of each company, together with carrying costs, would be deferred for ultimate recov-

If the amount deferred resulted in any cost to GPU Energy, the transition charge paid by customers scheduled to be phased out would be adjusted so that GPU Energy could recover its increased PLR costs, i.e., making customers pay more for electric service than if the rate caps remained in place and the transition charge was phased out. In the alternative, GPU Energy requested immediate generation rate cap increases in the amount of $316 million per year for both utilities pursuant to Section 2804(4)(iii)(D) of the Code, 66 Pa.C.S. § 2804(4)(iii)(D), to meet its ongoing cash requirements related to PLR obligations.

ARIPPA, Mid–Atlantic and York County, as well as numerous other parties, filed petitions to intervene in this proceeding. They argued that GPU Energy had not demonstrated it was entitled to an exception to the rate cap under the Competition Act because GPU Energy was responsible for its PLR losses as (1) it had made the unilateral decision to sell its generation assets, (2) failed to enter into long-term supply contracts to hedge its losses in the face of an unknown, volatile and immature supply market, and (3) acted under unrealistic expectations about the depth and maturity of the wholesale electric market coming out of the restructuring in the fall of 1998. The tracking mechanism would allow this exception and permit collection of the associated costs at a later time when ratepayers had no rate cap protection. They also argued that the tracking mechanism should not be granted because excess PLR service costs were not valid stranded costs and because implementation of the tracking mechanism would impermissibly shift costs from one customer class to another in violation of the Competition Act.

The ALJ recommended rejecting the request for a DTM in favor of granting $316 million in immediate rate increases. The ALJ determined that without PLR relief, the purchased power costs GPU Energy incurred to meet its PLR obligations denied it the opportunity to earn a fair rate of return stating:

> The DTM is designed to defer and later recover the net difference between its capped generation rates and its market cost of supply. The DTM would keep generation rates artificially low and would stifle competition. Instead, I recommend that Met–Ed be permitted an annual rate increase of $162,500,000 and that Penelec be permitted an annual rate increase of $154,200,000. This raising of the generation rate caps should allow for the entry, or re-entry, of electric suppliers into the Pennsylvania market and provide more competition and more choices for consumers.

(ALJ April 23, 2001 Recommended Decision and Order at 13.)

In its May 24, 2001 order, the Commission did not adopt the ALJ's recommendation regarding the rate cap and/or the DTM and instead held its disposition in abeyance to afford the parties an opportunity to attempt to resolve the matter in a Commission-facilitated "collaborative."

### C. NON–UNANIMOUS SETTLEMENT STIPULATION

A collaborative of all of the parties was convened on May 29, 2001, but it failed to achieve a consensus resolution of the issues raised in the petition for rate relief. However, on June 11, 2001, FirstEnergy

---

ery (or a credit) as either an increase or decrease to the companys' stranded costs.
• GPU Energy would file quarterly reports documenting the entries in its deferral ac-

counts, which would be subject to review by the Commission's Bureau of Audits.

and its merger partner GPU Energy proposed a non-unanimous "Settlement Stipulation" with the Commission requesting it adopt the ALJ's recommended decision of April 23, 2001, except as specifically modified by the non-unanimous Settlement Stipulation and to further adopt other matters set forth in the non-unanimous Settlement Stipulation. This non-unanimous Settlement Stipulation varied from the ALJ's decision by eliminating the GENCO Code of Conduct that the Commission had required as a condition of the merger. Further, although the ALJ recommended immediate rate relief of $316 million in increased rate charges for the utilities rather than a deferral of charges, the non-unanimous Settlement Stipulation provided for the establishment of a PLR deferral tracking mechanism by which GPU Energy would be held harmless from all increased PLR costs. Under the Stipulation, GPU Energy could defer the difference between its charges to retail customers for PLR service and its actual cost of supply beginning January 2, 2001, and continuing through December 31, 2005. Moreover, under the terms of the non-

unanimous Settlement Stipulation terms, the utilities would be permitted:

- to use NUG trust funds to satisfy stranded cost recovery and immediate cash needs;

- to lower competitive transition charges for five years and after that time raise those rates;

- extend the NUG and non-NUG Competitive Transition Charge for five years;

- terminate the NUG portion of the competitive transition cost five years earlier than provided for in the Restructuring Settlement; and

- change the priority assigned to NUG stranded cost recovery, placing NUG costs behind PLR costs.[27]

The Commission informed all of the parties who participated in the restructuring proceedings of GPU Energy of the Settlement and invited interested parties to respond within 42 hours. Clean Air, Citizen, ARIPPA, Mid–Atlantic and York, who were parties to the Restructuring Settle-

27. While it is clear that ratepayers will be paying hundreds of millions for GPU Energy's PLR costs, the non-unanimous Settlement Stipulation did not show exactly how that amount of revenue was going to be raised out of the competitive transition charge, though, the use of the deferral mechanism indicated that the purpose of the mechanism was to keep rate caps in place and there would be no rate increase by using excess competitive transition charges that would have otherwise gone to lowering rates.

It appears that one source for the revenues is NUG competitive transition charges. There has been an over-recovery of NUG stranded costs compared to what was reflected in the Restructuring Settlement due to the increase in the wholesale price of electric power. As wholesale market prices increased, the amount of NUG power costs that were considered stranded costs decreased. However, under the non-unanimous Settlement Stipulation, GPU Energy is permitted to use those

funds for any NUG costs, i.e., non-stranded costs, incurred under NUG contracts. In other words, revenues received from ratepayers for current electric non-stranded NUG generation capacity will be kept by GPU Energy, while payments to NUGs will not be made for non-stranded NUG generation but will be paid out of competitive transition charges.

GPU Energy is also authorized to keep track of whatever it spends to procure generation services for its PLR load. GPU Energy would defer the excess costs between energy and capacity costs it pays to procure electric generation services to fulfill its PLR obligation and the costs it recovers through its generation rates under the rate cap. Those excess costs would then be recovered through the competitive transition charge. The non-NUG competitive transition charge paid by all ratepayers would be extended for five years, and any funds not recovered from NUG over-recovery appears to be paid from that source.

ment, each submitted comments opposing the non-unanimous Settlement Stipulation.

Not adopting the ALJ's recommendation, rejecting Intervenors' oppositions, and finding that the non-unanimous Settlement Stipulation was in the public interest, the Commission entered an order on June 20, 2001, adopting the GPU Energy and FirstEnergy settlement proposals without modification, but making detailed findings as to why it believed the settlement was in the public interest. Addressing the due process arguments raised by the commenting parties, the Commission found there had been ample time allotted to all parties to comment on the matter as they had been involved in the proceedings throughout and had been aware since the filing of the deferral petition of the issues that were eventually resolved by the non-unanimous Settlement Stipulation. As to the DTM, the Commission found that GPU Energy was incurring and would continue to incur significant losses in the provision of PLR service, and without some form of relief from the rate cap, it would be denied the opportunity to earn a fair rate of return. Therefore, in lieu of a rate increase, the DTM would track losses for accounting and ratemaking purposes for a limited time period with a narrow opportunity to recover those costs within the existing rate caps before they were written off.

Regarding the elimination of the GEN-CO Code of Conduct, which prevents self-dealing between GPU Energy, FirstEnergy and their affiliates, the Commission did not explain why it eliminated a condition that it had just affirmed as a condition of the merger. It did, however, state it was satisfied that the elimination of that Code was consistent with the overall objectives of minimizing the amount of excess PLR costs incurred by GPU Energy and it was necessary to ensure maximum flexibility to GPU Energy in procuring reasonably-priced generation supply to serve its PLR customers. The Commission also agreed that the competitive default service program would not be implemented except at FirstEnergy's option and that it was not anti-competitive or inconsistent with the Restructuring Settlement. The Commission noted that to date, the competitive default service program had not produced positive results because no qualifying bids had been submitted and nothing in the Code obligated an electric distribution company to competitively bid its PLR service.

Regarding the extension of rate caps for an additional three years beyond the dates set forth in the Restructuring Settlement, the Commission believed consumers would benefit from the extension because it would allow the companies to perform long-term system planning and enable them to implement coordinated system improvements that would result in a safe and more reliable transmission and distribution system. It further stated that it agreed with the ALJ that the extension was a reasonable mechanism for addressing the issue of merger savings.

As to the NUG trust funds, the Commission accepted the Settlement provisions allowing GPU Energy to access the NUG Trust Funds funded by the competitive transition cost which were to pay NUGs for "stranded" or above market costs. To pay for the full cost of capacity and energy payable under the NUG agreements, stranded costs were deferred to a later date, possibly until after 2010, even though the competitive transition charges were to fund those costs. It found that the amendment did not place the NUGs in a less secure position than they were under the Restructuring Agreement, but provided for the portion of a NUG payment that exceeded the higher of the capped generation rate or the market price to be recov-

ered out of stranded costs.[28] In fact, the Commission concluded the flexibility that GPU Energy and FirstEnergy would have in withdrawing money from the NUG trusts would actually facilitate the payments owed to the NUGs under the existing contracts. Finally, the Commission determined that if the merger was not consummated, the PLR proceeding should be reopened.[29]

■ These consolidated appeals by ARIPPA, York County, Mid–Atlantic, Clean Air and Citizen of both the May 24, 2001 order and the June 20, 2001 order followed.[30] Clean Air and Citizen raise

**28.** Regarding the environmental and efficiency initiatives, the non-unanimous Settlement Stipulation required that First Energy deposit $2.5 million into both Met–Ed's and Penelec's Sustainable Energy Funds providing consumers with immediate benefits as they resurrected and provided substantial additional funding to the funds.

**29.** The Commission stated:

[A]bsent the merger, Met–Ed and Penelec have agreed that the deferred PLR costs accrued from January 1, 2000 through May 31, 2001 will be written off. Then, within 10 days after abandoning the merger, the Commission will reopen the POLR proceeding and permit evidence on overall retail levels and PLR deferrals prospectively. The Commission will enter final order in this proceeding within 90 days of abandonment of merger. The subsequent Commission determination, however, will not prevent recovery of deferrals accrued between June 1, 2001 and the date of the Commission's Order, except that PLR costs incurred after December 31, 2001 will be subject to normal prudency and just and reasonable rate requirements. Also, the method and timing of recovery will be determined as part of [the] reopened proceedings.

(Commission June 20, 2001 Opinion and Order at 37–38.)

**30.** In response to Intervenors' appeals, the Commission, GPU Energy and FirstEnergy filed motions to quash, contending that because Intervenors did not have a direct interest in the proceedings and were not adversely affected by its outcome, they lacked the requisite standing to appeal. Specifically, they assert the following:

● Because the Settlement provided for an increase in shopping credits which would enable customers to shop for other electric suppliers and thereby increase competition, Mid–Atlantic would be better positioned to compete for customers in the companies

servicing area and was not adversely affected by the Settlement;

● Clean Air and Citizen were not aggrieved with respect to their environmental claims because the Commission lacked jurisdiction to address their concerns and they cannot pursue claims relevant to customers as they do not represent customers in this litigation. Citizen cannot raise claims as to the Restructuring Agreement because it was not a signatory to that agreement; and any due process claims must be quashed because both parties were given ample opportunity to respond to the stipulation and in fact submitted their comments to the Commission; and

● Because the final order clearly recognized GPU Energy and FirstEnergy's ongoing obligation under the power contract with York and other existing NUG contracts in accordance with their terms, York was not directly harmed by the final order.

To have standing, the person must have been aggrieved. *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975). "Standing" requires that the person be adversely affected by the matter challenged in order to assure that the person is the appropriate party to bring the matter to judicial resolution. *Drummond v. University of Pennsylvania,* 651 A.2d 572 (Pa. Cmwlth.1994), *petition for allowance of appeal denied,* 541 Pa. 628, 661 A.2d 875 (1995). To appeal an agency adjudication, the person must have been a "party" with the agency who is "aggrieved" by the action and has a "direct interest" in the subject matter of the proceeding. 2 Pa.C.S. §§ 702 and 752; 1 Pa.C.S. § 101. A party is aggrieved when adversely, directly, immediately and substantially affected by a judgement, decree or order. *ACS Enterprises, Inc. v. Norristown Borough Zoning Hearing Board,* 659 A.2d 651 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 542 Pa. 674, 668 A.2d 1136 (1995); *Pittsburgh Trust for Cultural Resources v. Zoning Board of Adjustment of the City of Pitts-*

issues regarding the Commission's approval of the merger between FirstEnergy and GPU Energy. The other Intervenors, ARIPPA, York County and Mid–Atlantic, as well as Clean Air and Citizen, argue that the Commission erred in approving the non-unanimous Settlement Stipulation, because they were parties to the Restructuring Agreement but not the non-unanimous Settlement Stipulation, so the approval violated their due process rights. Further, GPU Energy was not entitled to relief from the rate cap limitations, but even if it were, the Commission erred in concluding that PLR costs in excess of generation rate cap levels could be recovered through the competitive transition charges assessed to customers as stranded costs rather than only through a rate cap increase.

## III.

### A. MERGER APPEAL

Clean Air and Citizen contend that the Commission erred by approving the merger and granting the certificate of public convenience to the merged companies. The standard for approving a merger and granting a certificate of public convenience is found under Section 1103(a) of the Code, 66 Pa.C.S. § 1103(a), which provides in relevant part:

> A certificate of public convenience shall be granted by order of the commission, only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation convenience, or safety of the public. The commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable.

In *York v. Pennsylvania Public Utility Commission*, 3 Pa.Cmwlth. 270, 281 A.2d 261 (1971), *affirmed*, 449 Pa. 136, 295 A.2d 825 (1972), a case involving the merger of three telephone companies that the Commission approved and we affirmed, we held that a certificate of public convenience ap-

*burgh*, 145 Pa.Cmwlth. 503, 604 A.2d 298 (1992), *petition for allowance of appeal denied*, 538 Pa. 618, 645 A.2d 1320 (1994). An association may have standing solely as the representative of its members and may initiate a cause of action if its members are suffering immediate or threatened injury as a result of the contested action. *National Solid Wastes Management Ass'n v. Casey*, 135 Pa.Cmwlth. 134, 580 A.2d 893 (1990).

Each of the Intervenors to this action appeared before the Commission and participated in the extensive hearings that resulted in the non-unanimous Settlement Stipulation. By not having raised the generalized standing argument before the Commission, that argument is waived. Moreover, the Competition Act, which places an affirmative mandate on the Commission to foster competition and provide for NUG stranded costs and to protects consumers, gives the NUGs and competitors such as Mid–Atlantic standing to challenge the non-unanimous Settlement Stipulation. Citizen and Clean Air, who represent ratepayers, have standing to oppose the rate increase and the purported discrimi-

natory impact of that rate increase. In any event, because the terms of the original restructuring agreement, which included provisions relating to rate cap increases, shopping credits and the priority of NUG contracts were significantly altered by the final order, Mid–Atlantic, York and ARIPPA as signatories to that agreement have standing to appeal the approval by the Commission of the non-unanimous Settlement Stipulation which substantially changes the terms of the Restructuring Settlement.

Finally, to a large degree, the Commission and GPU Energy's argument that Intervenors do not have the right to appeal and those appeals should be quashed is disingenuous, because it is based on the proposition that the non-unanimous Settlement Stipulation that they proposed or adopted would not harm the Intervenors because if they said Intervenors were not harmed, Intervenors were not harmed.

Because Intervenors have the requisite standing to bring this action, the motions to quash are denied and the issues set forth above will be addressed on their merits.

proving a merger of public utilities was not to be granted unless the Commission was able to determine by substantial evidence that public benefit would result from the merger. We specified that those seeking the merger were required to demonstrate more than the mere absence of any adverse effect upon the public, i.e., that the merger would promote the service, accommodation, convenience or safety of the public in some substantial way.

■ In addition, 66 Pa.C.S. § 2811(e)(1) requires the Commission to consider whether a proposed merger is "likely to result in anti-competitive or discriminatory conduct, including the unlawful exercise of market power, which will prevent retail electricity customers in this Commonwealth from obtaining the benefits of a properly functioning and workable competitive retail electricity market." Subsection (2) of that same section precludes the Commission from approving a merger "except upon such terms and conditions as it finds necessary to preserve the benefits of a properly functioning and workable competitive retail electricity market." 66 Pa.C.S. § 2811(e)(2).[31]

## 1. PUBLIC INTEREST

■ Clean Air and Citizen argue that the Commission erred in approving the merger because there was not compelling evidence that would establish that the merger would be in the public interest. Our review of the record shows that substantial evidence was adduced at the hearings that the merger would be in the public interest because:

- First Energy and GPU Energy's adjoining service areas and interconnected transmission systems would allow enhanced customer service;
- it would create an estimated cost savings in the amount of $150 million in cost savings for the merged entity;
- the merger would enhance the capability of the merged parent companies to invest in new facilities and emerging technologies that would be cost prohibitive for a smaller company; and
- the merger would provide customers with a wider range of energy services and products than either company could alone achieve.

Moreover, the Federal Energy Regulatory Commission (FERC) had found that the merger would be in the public interest. See FERC Order Authorizing Merger, FERC Docket No. EC01–22–000, Order (Issued March 15, 2001). Accordingly, the Commission did not err in finding that the public interest was served by allowing the merger.

## 2. CONSUMER SAVINGS

Clean Air and Citizen contend that GPU Energy and FirstEnergy did not offer substantial evidence that the merger would benefit the public because the merger would not require FirstEnergy to mitigate the costs and risks of GPU Energy's procurement of power to provide PLR service. Further, they did not propose to share any of the $150 million in annual savings that they estimated would accrue as a result of the merger, even though ratepayers would be paying for non-NUG transition charges longer, while GPU Energy and FirstEner-

---

**31.** In reviewing the Commission's approval of the merger and the grant of the certificate of public convenience, our scope of review is limited to determining whether the Commission made an error of law, its findings were not supported by substantial evidence or there was a violation of constitutional rights. *York.* We note that our general rule is to defer to the discretion of the agency where the matter calls for its special expertise. *Ardolino v. Pennsylvania Sec. Com.,* 145 Pa.Cmwlth. 40, 602 A.2d 438 (1992).

gy would be benefiting from the anticipated cost savings. They point out that the non-unanimous Settlement Stipulation did not resolve how customers would receive savings from the merger or quantify those savings. While the Commission found that extending the rate cap for three more years was a benefit to customers and a reasonable mechanism to address the issue of merger savings, Clean Air and Citizen contend there was no evidence that the freeze would benefit customers. If GPU Energy was already earning a reasonable return under the capped rates and no cost increases were expected, Clean Air and Citizen contend it would have no reason to file for a rate increase.

The President of FirstEnergy, Anthony Alexander, testified before the Commission regarding the anticipated cost savings as a result of the merger, stating the following:

**Q. Will the merger create cost savings?**

A. Yes. FirstEnergy anticipates that the merger will result in overall aggregate cost savings opportunities that are currently estimated to be about $150 million per year on a total combined company basis.

**Q. How did FirstEnergy arrive at its cost savings estimate?**

A. The estimated total annual savings of $150 million for the combined company is based upon an assumed five percent (5%) reduction in operating and maintenance costs. This estimated savings amount is typical of calculations developed in other mergers and is not based on a detailed evaluation of savings. These savings would be attributed to each particular FirstEnergy entity, as appropriate.

It is important to emphasize, however, that the potential for cost savings is not the primary factor justifying the merger. This merger is primarily intended to create significant strategic advantages, not capable of quantification. The value of this merger is in large measure the economies of scale and scope, increased efficiencies, as well as the values, goals and commitments to success that are shared by FirstEnergy and GPU.

(Reproduced Record at 532a–533a.)

As can be seen, the $150 million figure was neither based on a detailed study nor do those savings just involve GPU Energy's operations but are spread across FirstEnergy's operations as well. While the Commission's argument that extending the "rate cap" for three years may aid ratepayers, to be of benefit, rates would have to be less than the "rate cap" and not subject to the DTM. Nonetheless, because of the speculative nature of the cost savings and how they will be distributed across FirstEnergy's system, we cannot say that the Commission abused its discretion in not being more specific by providing a medium at this time to take into consideration prospective cost savings. However, in its June 20, 2001 decision, the Commission acknowledged that there was a "lack of evidence regarding issues such as the specific role FirstEnergy will play in assisting Met–Ed and Penelec, both monetarily and in terms of generation, in meeting their PLR responsibilities, and the quantification of merger savings that would flow to ratepayers makes it impossible, at this point, to approve the disposition of the merger savings." (Commission May 24, 2001 Opinion and Order at 38.) Accordingly, the Commission ordered that the disposition of merger savings be addressed in the collaborative on rate cap issues. However, because the collaborative was unable to resolve issues relative to their request for rate relief, including the merger savings issue, we remand to the Commission only to determine the amount

of merger savings and the allocation of those savings.

### 3. ENVIRONMENTAL CONCERNS

Clean Air and Citizen also argue that the Commission never examined whether the benefit of the merger would be offset by the merger-induced environmental harms they brought to its attention. They contend they provided evidence that FirstEnergy intended to run certain of its coal-fired power plants at a higher capacity to provide a portion of GPU Energy's PLR obligation. Witness Robert Kaiser testified that a 5% increase could be expected from the FirstEnergy Bruce Mansfield generating station in northwestern Pennsylvania and the W.H. Sammis generating station in Ohio, very close to the Pennsylvania border, and Sammis currently emitted air pollutants at high rates. Clean Air and Citizen aver that increased pollution is a detriment to the public because power plant air pollution is known to cause premature death and other major health impacts in Pennsylvania.

■■■ While the Commission had the power to deny a certificate of public convenience that was inconsistent with the public interest, including environmental concerns, 66 Pa.C.S. § 1103(a), we do not believe that it abused its discretion by not considering the impact in this case. Every Commission case should not be used to decide issues that are ancillary to the main case, i.e., a case within a case. Here, the Commission adopted the ALJ's decision that the record did not support a finding that the merger would benefit or harm the environment. The ALJ made that determination because the allegations made by Clean Air and Citizen were part of a pending lawsuit against FirstEnergy's subsidiaries Ohio Edison and Penn Power brought by the Department of Justice on behalf of the Environmental Protection Agency (EPA), and the results of that suit could not be litigated before the Commission, which had no jurisdiction to assess the merits of the environmental claims in the lawsuit. *See Country Place Waste Treatment Company, Inc. v. Pennsylvania Public Utility Commission,* 654 A.2d 72 (Pa.Cmwlth.1995) (air quality is regulated by DER or EPA, not the Commission). Because any issues regarding emission regulations were for the federal EPA or Pennsylvania's Department of Environmental Protection to determine, the Commission did not err in granting the merger without considering the environmental factors presented by Clean Air and Citizen.[32]

### 4. COMPETITION

Finally, Clean Air and Citizen argue that the Commission erred by approving the merger because FirstEnergy and GPU Energy failed to show that the merger would not adversely affect competition in retail markets. They contend that GPU Energy and First Energy's witness, Rodney M. Frame, only testified regarding the effect of the merger on competition in the wholesale markets supplying electricity in Pennsylvania, but 66 Pa.C.S. § 2811(e)(1) requires that the merger not adversely affect the retail electricity market. In addition, Clean Air and Citizen point out that FirstEnergy and GPU Energy have subsidiaries that compete with one another to supply electricity to retail customers in Pennsylvania, and, at the very least, the merger would eliminate competition between the retail supply subsidiaries of the two merging companies.

**32.** 66 Pa.C.S. § 2802(21) deals with these out-of-state generators that pollute Pennsylvania air and directs "the commission will consult with the Department of Environmental Protection regarding this issue during the transition to retail competition."

■ GPU Energy and FirstEnergy provided testimony that the proposed merger would not prevent retail customers from obtaining the benefits of a properly functioning and workable competitive retail electricity market because it would result in the loss of only one retail market participant among a field of over 50 electricity retailers licensed by the Commission. Relying on that evidence, the Commission did not find that any evidence was presented to indicate an adverse impact on either the wholesale or retail markets resulting from the merger. It found that there was no evidence regarding a negative impact on the retail markets because GPU Energy is not in the retail market now, and competition would come from other electric retailers without any adverse effect. Moreover, the FERC had found that the merger would not have any anticompetitive effects. *See* FERC Order Authorizing Merger, FERC Docket No. EC01–22–000, Order (Issued March 15, 2001). Because there is no evidence that retail competition will suffer, the Commission did not err in approving the merger, and the Commission's May 24, 2001 order approving the merger is affirmed.

## B.

### NON–UNANIMOUS SETTLEMENT STIPULATION APPEAL

Unlike its approval of the merger, the Commission did not issue an adjudication but instead approved, *albeit* with findings of fact and conclusions of law, the nonunanimous Settlement Stipulation as proposed by GPU Energy, FirstEnergy and joined by the Consumer Advocate as well as other groups not parties to this appeal. Non-unanimous settlements, while not common, are not unique and have been the source of some controversy. Professor Stefan H. Krieger of Hofstra University, in his article *Problems for Captive Ratepayers in Nonunanimous Settlements of Public Utility Rate Cases*, 12 Yale J. on Reg. 257, 265 (1995),[33] sets forth their origin and policy reasons for and against where they have been found to have or not have had a statutory basis. Professor Krieger noted:

In the context of public utility regulation, however, a unique and disturbing practice has arisen: the nonunanimous or contested settlement. [Alternate Dispute Resolution] mechanisms have rarely departed from the traditional concept of the litigation model in which all parties must either agree to the resolution of the dispute or at least to the procedures that will lead to that resolution. While some states require unanimous consent before allowing settlements of rate cases, many public utility commissions have abandoned the traditional predicate for settlement, unanimity, and have approved rate case settlements to which several of the parties have not given their assent. As long as the utility and perhaps one or two other parties reach an agreement with the commission staff, these commissions are willing to approve the agreement and to forgo the requirement of a full evidentiary hearing. They reason that such a procedure is necessitated by the sheer number of parties involved in rate cases and the ability of a single party to obstruct an otherwise reasonable settlement. Accordingly, these commissions see the oxymoronic notion of a nonunanimous or contested settlement as the only realistic

---

**33.** *See also* Buchmann *et. al., Nonunanimous Settlements of Public Utility Rate Cases: A* *Response,* 13 Yale J. on Reg. 337 (1996).

means of implementing the settlement process in these cases.

The danger of such an approach is obvious. Parties with a substantial interest in a utility proceeding can be left out of the decision-making process. Although commissions that permit nonunanimous settlements require review of these settlements to determine their reasonableness, these commissions often defer to the decision of the consenting parties. The utility can come to the bargaining table with a proposal, walk away from negotiations whenever it finds the counterproposal of some other party objectionable, continue discussions with the commission staff, and then present to the commission an agreement with the staff as a settlement. Furthermore, in their zeal to reap the benefits of the nonunanimous settlement process, commissions shift the burden of proof to the nonconsenting parties by forcing them to prove the unreasonableness of the settlement. While both traditional regulatory hearings and the unanimous settlement process provide protection for all parties, the nonunanimous settlement process places some parties at a severe disadvantage.[34]

In this case, Intervenors—the NUGs, Competitors and Consumer Groups—claim

they were disadvantaged because after litigating the entire case, they were entitled to a unbiased adjudication, not a decision to justify the Commission's support of GPU Energy's and FirstEnergy's position. They also argue that the Commission, by approving a "settlement" proposed by the utility that initiated the proceeding, had been "captured" by the monopoly utility [or "rented" as the law and economic professors and economists would now describe agency actions] to save those utilities from their own actions.

Not surprisingly then, Intervenors challenged the non-unanimous Settlement Stipulation arguing that it violated their constitutional rights because when the Commission abandoned the "collaborative" effort to resolve this matter and instead decided to "cram down" the settlement:

- their due process rights were violated because they did not have adequate time to respond to the FirstEnergy and GPU Energy Settlement Proposal; and

- the non-unanimous Settlement Stipulation unconstitutionally altered the Commission Approved Restructuring Settlement signed by all the parties to that agreement.

---

34. In her dissenting statement, Commissioner Brownell echoed similar concerns. She stated, in part:

I respectfully concur in the approval, with conditions, of the merger[.] Although I would prefer to resolve merger savings along with the approval, I concur with the merger approval as conditioned.

The request of GPU for a Section 2804 exception to the rate cap is a different proposition entirely. It is from that portion of the motion that I must regretfully dissent. Quite simply, we have a record before us. The parties have expended substantial resources litigating this issue. It is time for it to be resolved and I believe the record provides us with a very clear answer.

... I have always supported the use of collaboratives, settlements and other efforts to bring certainty and closure to cases. However, collaboratives should not be used as substitutes for facts....

[W]hen a party presents us with its case on the merits and has neither settled, nor met its burden of proof, we have not given the litigant the luxury of alternative consideration. I am concerned that we may be perceived as setting a double standard by our action today.

(Statement of Commissioner Nora Mead Brownell, May 24, 2001 PUC Opinion and Order at 1–5).

While challenging the way the non-unanimous Settlement Stipulation was approved and its effect on other orders, surprisingly, Intervenors do not challenge the ability of the Commission to approve such a settlement.

 Because that issue was not raised, we will not address the issue of whether the Commission can enter such an order; nonetheless, the question still remains regarding our scope of review of the Commission's decision approving the non-unanimous Settlement Stipulation. Ordinarily, appellate review of an order of the Commission is limited to determining whether a constitutional violation or error in procedure has occurred, the decision is in accordance with law, and the necessary findings of fact are supported by substantial evidence. *AT & T v. Pennsylvania Public Utility Commission*, 558 Pa. 290, 737 A.2d 201 (1999). Moreover, "an administrative agency's expert interpretation of a statute for which it has enforcement responsibility is entitled to great deference and will not be reversed unless clearly erroneous." *Tool Sales & Service Co. v. Commonwealth*, 536 Pa. 10, 22, 637 A.2d 607, 613 (1993); *Popowsky v. Pennsylvania Public Utility Commission*, 550 Pa. 449, 706 A.2d 1197 (1997). However, because the Commission has, in effect, approved a settlement, the question then becomes whether we give its findings and legal conclusions the same effect as if it had issued a formal adjudication.

Fact-finding involves reasoned judgement based upon the evidence before the Commission. The Commission would argue that it engaged in such fact-finding when it issued its adjudication in support of the non-unanimous Settlement Stipulation. What is at issue is whether fact-finding made to support a settlement is the same as independent fact finding, adjudicative fact-finding, when there is no pre-ordained outcome. Fortunately, we do not have to answer that question because on appeal, there are no operative facts at issue, only the legal effects of those facts.

 Because the facts are not in dispute but only their legal effects, whether we are required to give deference to the Commission's interpretations of law is a much more important question. Normally, no deference is given when an agency interprets a statute to justify its position in litigation, as in a brief filed in court. *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Nor are Interpretative Rules and Statements of Policy entitled to deference. *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Only when an agency is acting in its expert capacity, either issuing a regulation or acting in an adjudicative capacity, is an agency given deference in its interpretation of a statute. When an agency makes legal interpretations in support of a non-unanimous Settlement Stipulation, it appears to be somewhere between taking sides in a legal dispute and using its expert judgement in issuing an adjudication. Again, fortunately, because the result would be the same if we gave strong deference to the Commission's interpretation or no deference, we do not have to answer that question and will apply the same scope of review as if the Commission had issued an adjudication, not a decision in support of a non-unanimous Settlement Stipulation.

## 1. DUE PROCESS VIOLATION

 Intervenors assert that the Commission violated their due process rights [35] because they neither had ade-

---

**35.** Clean Air, Citizen and Mid–Atlantic failed

to raise any due process issues before the

quate notice of the issues being implicated in the non-unanimous Settlement Stipulation nor were they afforded adequate time to respond to that proposed non-unanimous Settlement Stipulation. As to adequate notice of the issues involved, they contend that the non-unanimous Settlement Stipulation amended the 1998 Restructuring Settlement, and they did not have adequate notice that their rights would be implicated. As to timeliness of notice, they contend that they received notice of the non-unanimous Stipulation Agreement by e-mail at approximately 6 p.m. on June 11, 2001, and were only given until 12 noon on June 13, 2001 to respond.

The Commission, GPU Energy and FirstEnergy assert that the time allocated for Intervenors to respond to the Settlement was sufficient to fulfill due process requirements as the parties were made aware of many of the pending issues throughout the litigation, had litigated those issues fully, and while they were only given approximately 42 hours to respond, the non-unanimous Settlement Stipulation was substantially similar to the May 7, 2001 Stipulation that Intervenors had already reviewed. In any event, the Commission, GPU Energy and FirstEnergy contend there cannot be a due process violation because, at least relative to the NUGs, they were not harmed by the order because no one abrogated their contracts

with the utility, and they were going to be paid in accord with their contracts with the utility even if not in accord with the 1998 Restructuring Settlement.

■ If this were the first time that Intervenors had seen the non-unanimous Settlement Stipulation, we would agree with them that the notice was inadequate given the complexity of the issue and the need for understanding the issues. However, our review of the May 7, 2001 proposed Stipulation shows that it was substantially similar to the non-unanimous Settlement Stipulation to which all parties were allowed to reply in their reply exceptions and was discussed in the "Collaborative." While the Commission's actions in only giving 42 hours notice is certainly at odds with a collaborative approach or any Alternative Dispute Mechanism, we cannot say that its notice in this circumstance violated Intervenors' due process rights.

## 2. UNCONSTITUTIONAL IMPAIRMENT OF THE RESTRUCTURING AGREEMENT

Some of the Intervenors argue that by changing the terms of the Restructuring Settlement, the Commission violated principles of contract law and Article I, Section 10 of the United States Constitution and Article I, Section 17 of the Pennsylvania Constitution[36] by impairing an obligation

Commission, and, as such, they cannot be raised on appeal for the first time. *See* Pa. R.A.P 1551. Therefore, only the due process arguments raised by ARRIPA and York will be considered. Due process is required in administrative proceedings, *Rudolph v. Pennsylvania Blue Shield,* 553 Pa. 9, 717 A.2d 508 (1998), particularly when the administrative action is adjudicative and involves substantial property rights. *Conestoga National Bank v. Patterson,* 442 Pa. 289, 275 A.2d 6 (1971). Reasonable notice is basic, enabling parties to present objections accurately. *Pa. Coal Mining Association v. Insurance Dept.,* 471 Pa. 437, 370 A.2d 685 (1977). Section 504 of

Administrative Agency Law, 2 Pa.C.S. § 504, reflects the same principles in requiring, notice of hearing, an opportunity to be heard, stenographically recorded verbatim testimony, and a full and complete record. Further, pursuant to Section 703(g) of the Code, 66 Pa.C.S. § 703(g), prior to amending an order, the Commission must provide the parties with notice and an opportunity to be heard.

**36.** Article I, Section 10 of the United States Constitution provides, in relevant part that "[n]o state shall [pass any] law impairing the obligation of contracts[.]" Article I, Section 17 of the Pennsylvania Constitution provides:

or contract.[37] They argue that because the enforceability of settlement agreements is governed by principles of contract law, *Mazzella v. Koken,* 559 Pa. 216, 739 A.2d 531 (1999), and no modification can be made without the consent of those parties to the agreement, then the Commission cannot, even though it approved it by order, change the terms of the Restructuring Agreement entered into by, among others, all the parties to this proceeding.

■■■■■ Normally, a government agency does not have the authority to abrogate or reform contracts between private par-

ties because that would be an *ex post facto* impairment of a contractual obligation that was entered into through arms-length negotiations by the parties. *Harristown Development Corporation v. Department of General Services,* 135 Pa.Cmwlth. 177, 580 A.2d 1174 (1990), *revs'd on other grounds,* 532 Pa. 45, 614 A.2d 1128 (1992). Where, however, a settlement is approved by a Commission order because it resolves a matter that would, if not settled, be subject to Commission jurisdiction, then that settlement can be set aside or modified. Section 703(g) of the Code, 66 Pa.C.S. § 703(g), provides that: [38]

"No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed."

**37.** The non-unanimous Settlement Stipulation eliminated, without explanation, the NUG competitive transition charge by 2015, five years earlier than provided for in the Restructuring Settlement, even though that is prior to the time the NUG contracts expire and for which they are obligated to pay. NUGs contend that this is also one source of funds that will be used to pay the increase and they will not be paid. GPU Energy and FirstEnergy contend the non-unanimous Settlement Stipulation had no impact on GPU Energy's contract obligations under the Public Utility Regulatory Policies Act of 1978 (PURPA). GPU Energy and FirstEnergy say the NUGs will be paid but does not say how they will be paid, indicating that will be left to a future proceeding. Regarding its payment obligations to the NUGs under the Restructuring Settlement, GPU Energy and FirstEnergy were given discretion as to how revenues should be allocated for accounting purposes. Regardless of any change in the market, the NUG contracts would expire prior to the time when the NUG contract costs could be recovered through the competitive transition charge as provided for in the Restructuring Settlement and pursuant to the Competition Act. Because of the way we resolve this appeal, we need not address the NUGs' argument that the Competition Act requires that there be a separate competitive transition charge until their contract expires.

**38.** Even if the Restructuring Settlement was not approved by Commission order, there is

another exception to this general rule that contracts cannot be impaired by the Commission. Because a public utility's location of its facilities within a public right-of-way is merely a privilege, it is, by definition, revocable. No matter the terms of an agreement, because the right-of-way is held by the public body for public purposes, a utility does not have a proprietary interest in the permanent location of its facilities in the right-of-way. *Bell Atlantic–Pennsylvania, Inc. v. Turnpike Commission,* 703 A.2d 589 (Pa.Cmwlth.1997), *aff'd,* 552 Pa. 41, 713 A.2d 96 (1998).

Based on the use of the right-of-way, express authority was given to the Commission to abrogate agreements by Section 508 of the Code, which provides the Commission with general power to change the terms of all agreements between public utilities and private parties whether they deal with rail-highway crossings or other issues related to public utilities. That section provides:

The commission shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any contract heretofore or hereafter entered into between any public utility and any person, corporation, or municipal corporation, which embrace or concern a public right, benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or concerned with the public interest and the general well-being of this Commonwealth. Whenever the commission shall determine, after reasonable notice and hearing, upon its own motion or upon complaint, that any such obligations, terms, or conditions are

The commission may, at any time, after notice and the opportunity to be heard as provided in this chapter, rescind or amend any order made by it. Any order rescinding or amending a prior order shall, when served upon the person, corporation or municipal corporation affected, and after notice thereof is given to the other parties to the proceedings, have the same effect as is herein provided for in original orders.

Although the Commission has the power to modify or rescind orders subject only to the requirements of due process, that power must be "granted judiciously and only under appropriate circumstances." *City of Pittsburgh v. Pennsylvania Department of Transportation,* 490 Pa. 264, 416 A.2d 461 (1980).[39] Because the Restructuring Settlement was approved by formal Commission order and such orders are always subject to change, the Commission had the power to modify it without violating constitutional principles of due process.

### 3. RATE INCREASE

At the same time it sought to have the merger approved, on November 29, 2000, GPU Energy filed a petition requesting Commission authorization to implement a rate increase to recover excess costs associated with its PLR obligation in the form of either an increased cost or a deferral tracking mechanism. Intervenors contend that the Commission erred in granting a rate increase above the rate caps in the guise of the DTM because it did not meet the requirements for relief from rate cap limitations under 66 Pa.C.S. § 2804(4)(iii)(D), because GPU Energy failed to (1) demonstrate that the rate increase was beyond its control and (2) that absent relief, GPU Energy would not be able to earn a fair rate of return as required by that section.[40] In response, GPU Energy, FirstEnergy and the Commission argue that the Commission did not err in finding that GPU Energy was entitled to relief from the rate cap limitations because the rate of return analysis in conjunction with the significant potential supply losses and the need to preserve GPU Energy's financial health and access to cash was necessary to enable it to continue purchasing wholesale power to meet its PLR obligations.

As to the first prong, Intervenors contend that GPU Energy was not entitled to rate cap relief because it failed to establish

---

unjust, unreasonable, inequitable, or otherwise contrary or adverse to the public interest and the general well-being of this Commonwealth, the commission shall determine and prescribe, by findings and order, the just, reasonable, and equitable obligations, terms, and conditions of such contract. (Emphasis added.)

Not wanting to interfere with market place decisions made by the parties regarding their various responsibilities, the General Assembly provided that the Commission had to determine that an agreement was adverse to the public interest before making any changes. Because we rely on the authority contained in 66 Pa.C.S. § 703(g), we need not reach whether this provision is applicable.

**39.** Our Supreme Court decided this case under then-Section 1007 of the Code, 66 P.S. § 1397, the predecessor to the present Section 703 of the Code, 66 Pa.C.S. § 703, which is nearly identical to the present language in Section 703(g).

**40.** 66 Pa.C.S. § 2804(4)(iii)(D) provides:

(iii) An electric distribution utility may seek, and the commission may approve, an exception to the limitations set forth in subparagraphs (i) and (ii) only in any of the following circumstances:

* * *

(D) The electric distribution utility is subject to significant increases in the unit rate of fuel for utility generation or the price of purchased power that are outside of the control of the utility and that would not allow the utility to earn a fair rate of return.

that the increases in purchased power costs were outside of its control. They argue that because GPU Energy made a strategic business decision in choosing to sell its generation assets, thereby exposing itself to the vagaries of the wholesale power market, and subsequently failed to implement effective risk management strategies that were within its exclusive control, the effects of those decisions, i.e., the burden of paying higher market-driven costs for electric generation services while remaining subject to the rate cap, were not outside of its control.

GPU Energy and FirstEnergy allege, however, that the rate increase was outside of GPU Energy's control because (1) it owned almost no generation; (2) it was subjected to volatile wholesale market prices over which it had no control and that were much higher than the projections of the parties to the 1998 restructuring proceeding; and (3) it had to furnish PLR service to a greater number of customers than was anticipated, largely due to the failure of its CDS program, due to the return of many customers to PLR service and departure of several suppliers from the GPU Energy territory.

Adopting the ALJ's recommended decision as modified by the non-unanimous Settlement Stipulation, the Commission found that although prior to the merger, GPU Energy voluntarily chose to divest itself of its generation assets, because that decision was based on the reasonable premise that a robust wholesale market and the operation of PJM would function in a manner that would further retail competition, GPU Energy's decision was reasonable and prudent when made. It further found that several variables such as

(1) wholesale supply costs in excess of the generation shopping credit and the resulting effects of crushing retail competition, (2) the magnitude and duration of customer shopping and customers returning to PLR service, (3) a mass exodus of alternative suppliers from the GPU Energy market, and (4) uncertain weather conditions and their impact on customer shopping and energy prices, were beyond the control of GPU Energy and subjected it to significant increases in prices for its purchased power.

However, the Commission's approval of the non-unanimous Stipulation Settlement raises the question of whether merely because a procurement practice was found to be reasonable and prudent at the time the decision was made, the losses incurred due to that "reasonable and prudent" decision were "outside of the control" of the decision-maker, in this case, GPU Energy. When a "reasonable and prudent" investment does not go the way it was planned, that does not mean the losses incurred as a result were out of the control of the company.[41] In her dissent to the Commission's decision granting rate cap relief, then-Commissioner Nora Mead Brownell, recently appointed to the Federal Energy Regulatory Commission (FERC) by President Bush, rejected such an interpretation of the term "outside of the control" used in the Competition Act as losses occurring as a result as "reasonable and prudent" actions, stating:

A few unrebutted facts should be stated up front. First, GPU determined to divest itself of its generation assets. GPU's management made that decision. Neither this Commission nor any other party forced it upon them. Second,

41. For example, a year ago an investment in Enron could be considered "reasonable and prudent." The company's bankruptcy and the resulting loss of investment were not out of the investor's control, because he or she could have invested in a long-term governmental bond.

GPU structured its own power acquisition portfolio. The risk management and purchase options were not dictated to GPU by its restructuring settlement or by this Commission. Despite these uncontroverted facts, GPU now appears and states that the results of its portfolio management were beyond its control.

\* \* \*

My interpretation of the foregoing is that asset divestiture was definitely within GPU's control and fit its own corporate strategy for the advent of a competitive retail marketplace. Having embarked on that strategy, it was incumbent upon GPU to take such steps as were necessary to ensure that its provider of last resort obligations were covered in a reasonable fashion. To me, the record clearly demonstrates that the company failed to do so.

In the Summer of 1999, wholesale market prices exhibited volatility which should have placed all market players on notice that risk management would be crucial in power supply portfolios. ME/PN St. 1–PLR, Exh. CAM–1; OCA St. 1–PLR at 13. At the same time that power markets were exhibiting signs of volatility, GPU was reviewing at least seven bids for energy supply. OCA Cross–Exam. Exh. 17. Despite witnessing that volatility, GPU completed its divestiture without any supply holdbacks.

The Office of Consumer Advocate described Duquesne Light Company's and Potomac Electric Company's actions upon divestiture. OCA St.1–PLR at 20. Each of those companies divested its generating assets, but entered into long term contracts to meet their provider of last resort obligations. Even more telling from my perspective is the fact that after signing its restructuring settlement, and during the period leading up to divestiture, GPU failed to conduct any analysis of the business risks associated with its strategy of divestiture contrasted with its prior position as a generation owner. OCA Cross Exam Exh.6.

\* \* \*

■ As has been noted, GPU made the original business decision to sell its generating assets. It was not forced to do so. One would expect a company to recognize its exposure and take appropriate action. GPU failed to do so. This is the point made by Mr. Kollen that I've cited above. More importantly, the statute clearly does not contemplate that the Commission will protect companies from business decisions that were within their control.

Understandably, GPU has made every effort to make the volatility of the wholesale energy markets the issue in this portion of the case. The issue, as set forth in the statute, is what did GPU do about that volatility. The answer is that it bet heavily on the spot market and a short-term portfolio without appropriate hedging mechanisms. The fact that it lost the bet does not automatically trigger rate relief. Had GPU won that bet, it is highly unlikely that it would be before the Commission seeking a return of profits to ratepayers. It is equally unlikely that this Commission would have a basis to order it to do so. However, the statute did not establish a "heads I win, tails you lose" construct.

(Commissioner Brownell's May 24, 2001 Dissenting Opinion at 2–4.) We agree with Commissioner Brownell's assessment that the Commission's interpretation is clearly erroneous because the plain meaning of the term "outside of the control" does not means that ratepayers will act as the surety for companies that act to maximize their return, and not, as other utili-

ties did, to protect their exposure from known and definable obligations.

■ An event "outside of the control" of a person or group typically refers to sudden illness, fire, theft, acts of God and natural disasters, not situations where a party can take actions to protect himself or herself from risk. *See Peister v. State of Colorado, Department of Social Services,* 849 P.2d 894 (Colo.Ct.App.1993). Strategic business planning always involves decisions on how much risk to accept and where the burden of risk is placed. In this case, GPU Energy made a choice to divest itself of its generation assets and, unlike other utilities, not to protect itself by entering into long-term contracts within the rate caps to protect itself from PLR costs. Instead, it made a bet that electric rates would remain below the rate caps and chose to maximize its profits. This was not an event outside of its control, but a conscious business decision. The General Assembly did not intend that if a utility lost money on choices it made, it would be allowed to recover more in rates. As Commissioner Brownell stated, "the statute did not establish a 'heads I win, tails you lose' construct." Because an event that is "outside of the control" does not mean the results of business decisions, it was plainly erroneous for the Commission to allow revenues to be increased above the legislatively mandated rate caps.

■ Not only did GPU Energy not establish that the costs it incurred as a PLR were not out of its control, but it also failed to meet the second prong because it failed to establish that it was unable to earn a fair rate of return. GPU Energy, FirstEnergy and the Commission argue that GPU Energy's rate of return analysis, coupled with its significant potential supply losses and the need to preserve its financial health and access to cash necessary to enable it to continue purchasing wholesale power to meet its PLR obligations, was sufficient to justify rate cap relief. However, the only evidence going to rate of return went to the PLR service function of its business, rather than the overall return earned by GPU Energy in all aspects of its utility business, including revenues from its generation supply, transmission and distribution functions.

This position is also contrary to the Commission's position contained in its June 20, 2001 opinion that "an appropriate analysis of the rate of return issue should include a consideration of transmission and distribution revenues." June 20, 2001 Opinion and Order at 18. In reviewing a utility's rate of return, we must look at the utility as a whole, not one side of its business or another. In this case, GPU Energy and FirstEnergy only provided evidence as to the rate of return within GPU Energy's PLR service; they did not provide any evidence regarding GPU Energy's transmission or distribution revenues. Because a fair rate of return analysis should include a utility's rate of return overall rather than only one specific aspect of its business, and GPU Energy and FirstEnergy failed to provide any evidence regarding rate of return within GPU Energy's transmission and distribution functions, they did not establish that without relief from the rate cap, GPU Energy would not be able to earn a fair rate of return as required by 66 Pa.C.S. § 2804(iii)(D).

### 4. USE OF STRANDED COSTS IN LIEU OF RATE INCREASE

■ Not only did the Commission err in finding that sufficient grounds existed to increase rates under 66 Pa.C.S. § 2804(4)(iii)(D), the method it chose to implement the rate increase was improper because it violated the Competition Act. Competitive transition charges cannot be

used to fund GPU Energy's PLR costs because 66 Pa.C.S. § 2804 only authorizes exceptions to the rate caps through an increase in the rates charged for current service, not the competitive transition charges. Competitive transition charges are legislatively mandated to pay only stranded costs.[42] Stranded cost determinations are backward looking in that stranded cost recovery provides a means to pay former monopolies for costs previously incurred or obligated in a regulated environment that they would be unable to recover through prospective competitive market-determined prices. *See Indianapolis Power & Light v. Pennsylvania Public Utility Commission,* 711 A.2d 1071 (Pa. Cmwlth.), *petition for allowance of appeal denied,* 556 Pa. 698, 727 A.2d 1124 (1998), *cert. denied,* 526 U.S. 1005, 119 S.Ct. 1143, 143 L.Ed.2d 210 (1999). They were not meant to pay for costs associated with the current delivery and generation of electricity.

GPU Energy, FirstEnergy and the Commission argue, though, that the PLR costs GPU Energy seeks to be paid through competitive transition charges are appropriate because electric costs would have traditionally been recoverable in a regulated environment, and, therefore, are stranded costs. This argument is specious because what it means is that the competitive transition charge would be available to protect a deregulated utility from any adverse effect from competition. Pursuant to 66 Pa.C.S. § 2803, stranded costs were to be fixed forever as part of the utility's restructuring plan. In its restructuring plan, GPU Energy was paid for all of its

---

**42.** 66 Pa.C.S. § 2803 defines stranded costs as:

An electric utility's known and measurable net electric generation-related costs, determined on a net present value basis over the life of the asset or liability as part of its restructuring plan, which traditionally would be recoverable under a regulated environment but which may not be recoverable in a competitive electric generation market and which the commission determines will remain following mitigation by the electric utility. This term includes:

(1) Regulatory assets and other deferred charges typically recoverable under current regulatory practice, the unfunded portion of the utility's projected nuclear generating plant decommissioning costs and cost obligations under contracts with nonutility generating projects which have received a commission order, the recoverability of which shall be determined under section 2808(c)(1) (relating to competitive transition charge).

(2) Prudently incurred costs related to cancellation, buyout, buydown or regeneration of nonutility generating projects consistent with section 527 (relating to cogeneration rules and regulations), the recoverability of which shall be determined under section 2808(c)(2).

(3) The following costs, the recoverability of which shall be determined pursuant to section 2808(c)(3):

(i) Net plant investments and costs attributable to the utility's existing generation plants and facilities.
(ii) The utility's disposal of spent nuclear fuel.
(iii) The utility's long-term purchase power commitments other than the costs defined in paragraphs (1) and (2).
(iv) Retirement costs attributable to the utility's existing generation plants other than costs defined in paragraph (1).
(v) Other transition costs of the utility, including costs of employee severance, retraining, early retirement, outplacement and related expenses, at reasonable levels, for employees who are affected by changes that occur as a result of the restructuring of the electric industry occasioned by this chapter.

The term includes any costs attributable to physical plants no longer used and useful because of the transition to retail competition. The term excludes any amounts previously disallowed by the commission as imprudently incurred. To the extent that the recoverability of amounts that are sought to be included as transition or stranded costs are subject to appellate review as of the time of the commission determination, any determination to include such costs shall be reversed to the extent required by the results of that appellate review.

costs associated with the change to a non-regulated environment. The Competition Act froze rates until December 31, 2004, in return for utilities receiving their stranded costs fixed in the restructuring plan, and the only authorization for relief from those rates set forth in the Competition Act was a rate increase. Section 2804(4)(iii)(D) provides the only exception to the rate cap limitations is for a rate increase and does not provide that a utility may shift operational costs, i.e., purchased power costs into the competitive transition charge used to recover stranded costs. Because the costs GPU Energy and FirstEnergy seek to recover under the DTM proposal are not stranded costs within the meaning of the Competition Act, those costs cannot be recovered through the competitive transition charge.

■■■■ Moreover, the DTM violates the Competition Act because it would require customers who do not use PLR service to subsidize that service. GPU Energy's generation costs to serve its PLR load are recovered through the competitive transition charge which is paid by all GPU Energy distribution customers, those who purchase GPU Energy-provided generation and those who do not, i.e., shopping customers. Because all customers pay the competitive transition charge, the DTM improperly shifts generation costs used by GPU Energy's PLR customers to "shopping" customers and artificially lowers the comparison rate that competitors have to match or beat to compete with GPU Energy for customers. By doing so, the DTM violates the Competition Act's proscription because it sanctions anti-competitive and discriminatory conduct against both competitors and shopping customers. 66 Pa. C.S. § 2811(a).

Accordingly, even if we had found that GPU Energy had met the requirements set forth in 66 Pa.C.S. § 2804(iii)(D) for relief from the rate caps that it agreed to when it was paid for its stranded costs to fund increase PLR costs, the payment of those funds out of the competitive transition charge was not permitted under the Competition Act.

## 5. GENCO CODE OF CONDUCT

Finally, Intervenors contend the Commission improperly eliminated the GEN-CO Code of Conduct when it approved the non-unanimous Settlement Stipulation. The purpose of the Code, established in the 1998 Restructuring Settlement, was to prevent GPU Energy affiliates from favoring each other through cross-subsidization in market transactions, thereby protecting fair and open competition. In its order approving the merger, the Commission granted the merger subject to conditions, including:

[t]hat the GPU Codes of Conduct apply to this merger and to the activities of FirstEnergy in Pennsylvania after the merger, and provided further that, within thirty days of the effective date of the merger, the merged company issue training and education material about GPU Codes of Conduct to its employees. (Commission Opinion and Order entered May 24–20, 2001, at 82.)

Inexplicably, the Commission then approved the non-unanimous Settlement Stipulation which provided that "[t]he 'Genco' Code of Conduct applicable to Met Ed and Penelec will be eliminated effective with the Pa Commission's approval of this settlement and upon consummation of the merger." Non-unanimous Settlement Stipulation at 8.

■■■■ Section 703(e) of the Code, 66 Pa. C.S. § 703(e), requires the Commission to make findings "in sufficient detail to enable the court on appeal, to determine the controverted question presented by the

proceeding and whether proper weight was given to the evidence." The Commission's decision is sufficient if it refers to the facts in the record supporting its conclusion and sets forth the reasons for its decision. *See Wheeling v. Pennsylvania Public Utility Commission,* 778 A.2d 785 (Pa.Cmwlth.), *petition for allowance of appeal denied,* —— Pa. ——, 790 A.2d 1021 (2001).

■ In this case, the Commission explained its reasoning briefly in five lines stating, "[w]e are satisfied that the elimination of this Code of Conduct is consistent with the overall objectives of minimizing the amount of excess PLR costs incurred by GPU. Moreover, we believe that its removal is necessary to ensure maximum flexibility to GPU in procuring reasonably priced generation supply to serve its PLR customers." Commission's June 20, 2001 Order and Opinion at 24–25. Because the Commission failed to refer to any facts in the record and did not adequately explain its reasoning for its swift elimination of the GENCO Code of Conduct, the Commission erred in acceding to GPU Energy and FirstEnergy's non-unanimous Settlement Stipulation removing it from the merger terms. Therefore, the Code shall remain in effect as a condition of the merger.

### IV.

Accordingly, the decision of the Commission dated May 24, 2001, is affirmed as to the merger, but is remanded to the Commission only to determine the amount of merger savings and the allocation of those savings. The Commission's decision regarding GPU Energy's Provider of Last Resort obligations dated June 20, 2001, is reversed and GPU Energy's request for rate relief is denied. The Motions to Quash filed by the Commission, GPU Energy and FirstEnergy in response to the Petitions for Review filed by York, Mid–Atlantic, Clean Air and Citizen are denied.

### *ORDER*

AND NOW, this *21st* day of *February,* 2002, the order of the Pennsylvania Public Utility Commission dated May 24, 2001, is affirmed as to the merger, but is remanded to the Commission only to determine the amount of the merger savings and the allocation of those savings. The Commission's June 20, 2001 order regarding GPU Energy's Provider of Last Resort obligations is reversed and the rate relief requested by GPU Energy is denied. The Motions to Quash filed by the Pennsylvania Public Utility Commission, Metropolitan Edison Company, Pennsylvania Electric Company, GPU, Inc. and FirstEnergy Corp. in response to the Petitions for Review filed by York County Solid Waste and Refuse Authority, Mid–Atlantic Power Supply Association, Clean Air Council and Citizen Power, Inc., are denied.

Jurisdiction relinquished.